### Jonathan P. Bryant *and others* v. The American Telegraph Company.

A clause in the printed condition of a telegraph company, that they will not be responsible for mistakes or delay in the transmission of a message, applies merely to the transmission of the message, and not to mistakes, or a delay in the delivery of the message, after it has been correctly transmitted.

The plaintiffs sent a message to the defendants' office in New York, addressed to an attorney in Providence, Rhode Island, directing him to attach a house and lot in that city, of one B., who was then temporarily absent from Rhode Island, for a debt of twelve thousand dollars, due by B.'s firm to the plaintiff. The message was brought to the defendants' office, at half-past eight P. M., which was then closed for the ordinary transaction of business. Their agent was told that the message was important ; that unless it was sent and delivered at once it would be of no use ; that the object of the message was to get an attachment upon property in Providence ; that unless it was made before the Stonington train reached the Rhode Island State line, it would do no good ; that he would consequently see the importance of the matter, and why the plaintiffs were so urgent. The defendants' clerk assured the plaintiffs' messenger that the message would be sent and delivered as he wished, and that he would not take the money if he thought there was any doubt about it. The message was sent at ten minutes past nine, with directions from the operator in New York to send it in haste, and was received by the operator in Providence at half-past nine P. M., who was then engaged in receiving reports for the press, which, by statute, have pre-

Bryant v. The American Telegraph Company.

cedence over all other matters. The Providence operator answered that it could not be sent that night, as the delivery boy had gone home, to which the other answered that it must be, and the former replied by a sign expressing his concurrence. The Providence operator was engaged without exception in receiving newspaper reports until half-past eleven o'clock P. M., when he had the message copied, and sent to the attorney. When the attorney received it, it was too late to have the attachment made, before the arrival of B., who returned to Rhode Island in the Stonington train that morning, and the plaintiffs lost the advantage of securing their debt by an attachment upon B.'s house and lot, which was worth over twelve thousand dollars. B. soon afterwards went into bankruptcy, and all that the plaintiffs recovered upon their debt from the bankrupt estate was five hundred dollars.

*Held*, that the plaintiffs were not bound to exhaust their legal remedy against their debtors by the recovery of a judgment and the issuing of an execution before bringing an action against the telegraph company for the recovery of damages.

*Held*, that the measure of damages was the amount of the debt and interest from the day of the delivery of the message, less the five hundred dollars which the plaintiffs had received from the bankrupt estate of B. DALY, F. J., *dissenting*.

The judge, at the trial, was requested to charge that the only damages the plaintiffs could recover were the amount paid for sending the message, with such other expenses as were incident to it, which the judge refused. *Held*, that the refusal was correct. DALY, F. J., *dissenting*.

The facts of this case sufficiently appear in the opinion of DALY, F. J.

*Lewis B. Woodruff*, for appellants.
*B. & S. D. Cozzens*, for respondents.

DALY, F. J.—This action was brought to recover damages for a delay on the part of the telegraph company in delivering a message in Providence, by which the plaintiffs lost the opportunity of attaching a house and lot in that city, belonging to one Bennett, a member of the firm of J. H. Stury & Co., who were indebted to the plaintiffs in the sum of twelve thousand dollars.

The property of Bennett could be attached at the suit of creditors only while he was without the State of Rhode Island. He was seen in the city of New York by Draper, one of the plaintiffs, on the 24th of February, 1860, and left by the o'clock afternoon train of that day for Providence. At

Bryant v. The American Telegraph Company.

teen minutes past four, Draper learned that the firm were not able to meet their engagements, and that Bennett was on his way to Providence, upon ascertaining which, he went to the plaintiffs' attorney, and directed him to send a dispatch to Providence to have Bennett's house and lot attached for the debt. At half-past eight o'clock in the evening, the attorney went to the telegraph office of the defendants, in this city, which was then closed for the ordinary transaction of business, and asked if the line was open to Providence, and if a message could be sent there without delay. The clerk who was in attendance answered in the affirmative, upon which the attorney told him that the message was important, and unless it could go there "right away, and be delivered at once," it would be of no use. The cle· sured him that it could be sent and delivered as he wish ' gave the attorney a printed paper containing the cc upon which the defendants agreed to transmit messages, ........n and subject to which the attorney wrote down the message to be sent. It was addressed to a Mr. Payne, an attorney in Providence, directing him to sue J. H. Stury & Co., at the suit of the plaintiffs, for twelve thousand dollars upon promissory notes, and to attach Bennett's house and lot in Providence, advising him that it must be done before the Stonington train entered the State of Rhode Island. The attorney then told the clerk that the object of the message was to get an attachment upon property; that unless it was made before the Stonington train reached the State line, it would do no good, and that under such circumstances, he would see the importance of the matter, and why he, the attorney, was so urgent to know whether the message could be carried and delivered "right away." The clerk answered that of course it would go right away, and that he would not take his money if he thought there was any doubt about it. The attorney then paid him three dollars and eighteen cents; the clerk took the message to the operator, and after being absent a few minutes, returned and said: "It is half off on its way, and it will be there right off." It was then ten minutes past nine o'clock. The message was received by the operator in Providence as thirty minutes past nine, with a direction from the operator in New York to send it in haste. The operator in Providence was then engaged in receiving reports for the press,

37

Bryant v. The American Telegraph Company.

which by statute are entitled to precedence over all other mat-ters, and the operator then replied that the message could not be sent that night, as the delivery boy had gone home. The operator in New York responded that it must be delivered, and the other answered O. K., a sign expressive of his concurrence. The operator in Providence was engaged without cessation in receiving newspaper reports until half-past eleven o'clock, when availing himself of the cessation of the reports for awhile, he had the message copied, and a person coming in at the time with refreshments, he sent it by him to Mr. Payne, a few min-utes after half-past eleven. Mr. Payne was aroused from his bed, and the telegram delivered to him, but it was then too late to have the attachment made before t!          of Bennett in the State.

The house and lot which the plaintiffs mea          attach was worth over twelve thousand dollars. There was a mortgage upon the lot for ten thousand dollars, but the mortgage had not been recorded, and it would seem that by the laws of Rhode Island an unrecorded mortgage is no lien against an attachment. Within a few days afterwards the mortgage was recorded, and during the same month the firm of J. H. Stury & Co. went into bankruptcy in Massachusetts. The house and lot was sold under the mortgage for twelve thousand dollars and twenty-five cents, and all that the plaintiffs have received upon their debt has been five hundred dollars. Upon this state of facts they obtained a verdict against the defendants for twelve thousand one hundred and forty-five dollars and fifty-five cents, being the amount of their debt and interest, less the five hundred dol-lars collected by them.

The defendants moved for a nonsuit, upon the ground that they were not responsible, as this was an unrepeated message.

The printed conditions state that in order to guard against mistakes in the *transmission of messages*, every message of im-portance ought to be repeated by being sent back from the sta-tion at which it had been received, to the station from which it was originally sent. The company also limit their liability for mistakes or delays in the transmission or delivery of repeated messages to an amount not exceeding five hundred times the amount paid for sending the message, and it is further provided that the company will not be responsible for mistakes or delays

Bryant v. The American Telegraph Company.

in the transmission of unrepeated messages from whatever cause they may arise.

It is apparent from the wording of the conditions that there is a distinction between the transmission and the delivery of a message ; that the first means its transmission from the office or station at which it is received, to the one to which it is sent; and the other, the delivery of it to the person to whom it is addressed. The clause relating to messages which are repeated, refers to mistakes or delays in their transmission or delivery, while that which relates to unrepeated messages refers to mistakes or delays in their *transmission* alone. What is obviously meant by the latter clause is, that the company will not be responsible for any mistake or delay in the transmissi          es-sage, unless it is repeated, which has no applicatio          his case, as there was no mistake or delay in the transm.          of the message, but the delay was in the delivery after it had been correctly transmitted. That the message had not been repeated, therefore, furnished no ground for granting a nonsuit.

The defendants also moved for a nonsuit upon the ground that the plaintiffs had not shown that they had exhausted all legal remedies against their debtors by judgment and execution, but this was a matter which related merely to the amount of the damages, and did not affect the right of action. The motion for a nonsuit was therefore properly denied.

When the evidence was closed upon both sides, the defendant renewed his motion for a nonsuit upon the ground that the failure of the plaintiffs to issue their attachment in time was owing to the want of proper diligence on the part of the attorney in Providence. This was a point, however, upon which there was a large amount of conflicting testimony, and the question was one which the jury alone could decide.

Before submitting the case to the jury, the judge was requested to instruct them that the only damages which the plaintiffs could recover was the amount paid by them for sending the message, and such other expenses as were incidental to it, and that the value of the property which the plaintiffs meant to attach was not the measure of damages. The judge declined so to do, and at the close of his charge said to the jury, that if they found for the plaintiffs, the amount of damages should be the sum which the plaintiffs lost by not having the property

Bryant v. The American Telegraph Company.

attached, namely, twelve thousand dollars, less the five hundred dollars which they had collected, with interest, from the day when the telegram was sent. The property was sold afterwards for twelve thousand dollars and twenty-five cents, and this was making the value of the property to the extent of the plaintiffs' debt the measure of the damages, which was, I think, erroneous. It was implying that if this delay had not taken place in the delivery of the message, the attachment would have been made before Bennett returned to the State, and that if that had been the case, the plaintiffs would have obtained their debt.

This was assuming many contingencies that might or might not happen, viz.: that the attachment would have been issued and levied in time, that all the proceedings upon it would have been regular, that the plaintiffs would have obtained a judgment, and that twelve thousand dollars would have been collected upon the execution and paid to them, in satisfaction of their debt. All this might have happened, but that it would, was not sufficiently certain to warrant the assumption of all these circumstances, as a basis for the measure of damages. It was, as Judge STORY remarked in the case of *The Schooner Lively* (1 Gallison R., 314), "a calculation upon conjectures and not upon facts."

The plaintiffs have not lost anything which they ever possessed. They lost the chance of availing themselves of a newly discovered and extraordinary means of transmitting intelligence which, in their case, had their message been delivered as they wished, might have enabled them to take advantage of the circumstance of the temporary absence of their debtor, and attach his property for the amount of their debt. Assuming that that would have been done had their message been delivered immediately after its arrival in Providence, the only conclusion which it would warrant would be simply that they lost such security for the collection of their debt as would be afforded by the issuing and levying of an attachment, but everything beyond that was mere matter of conjecture. For all that was known to the jury, the debtors may have had a defence to the claim in whole or in part. It does not follow because attachment is procured that a judgment will also be obtained; yet that presumption has to be drawn in this case to warrant

Bryant v. The American Telegraph Company.

the still further presumption, that the plaintiffs lost their debt because they did not obtain the attachment.

The plaintiffs' debt has not been extinguished or discharged. They cannot be said to have lost it absolutely, as long as Bennett and the other three members of his firm remain liable for it. They were discharged as insolvents in Massachusetts, but that discharge is confined to that State, and does not exempt them from liability in other States or countries. They may all be insolvent now, and unable to pay, but this would not warrant the presumption that they will always remain so. In the contingencies of human affairs, any one of them may become possessed of property hereafter, and be compelled to pay this debt within the period during which it will survive as an existing obligation against them.

It is suggested that if the defendants should pay this verdict, they would, having paid the plaintiffs' debt, become subrogated to all the rights which the plaintiffs had to it, and would be entitled thereafter to maintain an action against the debtors for its recovery. Where a surety, to discharge his own responsibility, pays the debt, or where a party having an interest in land, for his own protection pays off an incumbrance, he takes the place of the former creditor, or as it is expressed in the law, is subrogated to all his rights in respect to the debt, and may enforce the payment of it (*Hayes* v. *Ward*, 4 Johns. C. R., 123; *Sandford* v. *McLean*, 3 Paige, 117; *Jenkins* v. *Continental Ins. Co.*, 12 How., 66). But I do not deem it necessary to inquire whether the defendants would come within this rule or not, if they should pay this verdict, as the point is wholly immaterial to the question now before us. We are to decide what is the proper measure of damages, and that is a question which must be determined by the contract alone.

In the recent work of Mr. Mylne upon damages, he remarks that in the case of contract, the measure of damages is much more strictly confined than in cases of tort, and that to hold a party who fails to perform a contract responsible for all that the other party ultimately hoped to get by it, or which it is possible he might have obtained, would be to make him an insurer without any premium for undertaking the risk, and upon the well-considered case of *Hadley* v. *Baxendale* (9 Excq. R., 341), he lays down the rule which governs in all cases of breach

of contract, a rule which was approved and acted upon in this State, in *Griffin* v. *Colver* (16 N. Y. Rep., 489), and in *Landsberger* v. *The Magnetic Telegraph Company* (32 Barb. R., 530), that the damages are such as appears to have been contemplated by both parties when the contract was entered into. Mylne on Damages, 6, 15. In deciding the case of *Hadley* v. *Baxendale, supra,* Baron ALDERSON said: "If the special circumstances under which a contract is made, are communicated and known to both parties, the damages resulting from the breach of it, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of the contract under the special circumstances so known and communicated. But on the other hand, if these special circumstances were wholly unknown to the party making the contract, he, at most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances from such a breach of contract."

In the present case, the circumstances known or communicated to the defendants when they made the contract, will not warrant the conclusion that they undertook to deliver the message with the understanding that they were to be answerable for the amount of the debt if it should be lost through their failure to deliver the message immediately after its arrival in Providence, and unless such was the case, they cannot be said, within the meaning of this rule, to have contemplated a liability in damages to that extent.

They were under no obligation to enter into any such engagement. The plaintiffs, in view of the importance of time, and of the contingencies which might happen, had not been especially diligent. They knew of the presence of Bennett in this city before four o'clock in the afternoon, and yet nearly five hours were suffered to elapse before their attorney came to the defendants' office to have the message sent. It was then in the evening, and after the office had been closed for the ordinary transaction of business, and if the plaintiffs failed to get their message delivered in time, it was owing to the late hour at which they brought it for transmission, and to a state of facts, very natural under the circumstances, existing at the office in Providence, when the message was received.

Bryant v. The American Telegraph Company:

Brought to them at such an hour, and liable to such contingencies as upon this occasion did happen, the defendants were not bound to transmit and deliver it within a certain time that night, upon the understanding that they were to be answerable in the sum of twelve thousand dollars, if they failed to do so. They might certainly make such an agreement, but where the compensation was so small, and the risk so great, it will not be inferred that they did, unless the circumstances clearly show that such was the understanding of both parties.

In a case before the Court of Queen's Bench, in Canada, (*Kingshorm* v. *The Montreal Telegraph Co. Decisions by English French and American Courts upon Telegraphic Communications, Utica, N. Y.*, 1863), the question of the liability of telegraphic companies, in damages, for negligence in the transmission and delivery of messages, came under consideration, and Justice McLEAN said : " It is, in my opinion, extremely doubtful whether in any such case, a party who avails himself of the facilities afforded in communicating by telegraph, can expect that a telegraph company shall be responsible for all damages, no matter what amount, which may arise in the hurry of transmitting a message, from any verbal inaccuracy of an operator, or from an omission in forwarding or delivering it when received. It ought not to be expected that so great facilities are to be afforded for so small a remuneration, and at a risk that might bring ruin upon any company, if obliged to indemnify for every possible loss. Where parties desire to establish such a responsibility, it should be arranged with the telegraph company or its agents, and then every information should be given as to the importance of the message desired to be sent."

The promise of the clerk that the message should be delivered at once upon its arrival in Providence, cannot be construed into an express or special agreement on his part, that the company would be responsible for this debt of twelve thousand dollars, if through their failure to deliver the message immediately, the plaintiffs should fail in getting their attachment. If such a responsibility can arise only, as Justice McLEAN suggests, where it is established by an arrangement with the company or its agents, and where every information is given to show the importance of the message, then there was wanting in this case, either any express arrangement to that effect, or such a dis-

closure of the circumstances to the clerk as to warrant the conclusion that he knew exactly what would be gained if the attachment was made, or lost, if it should not be procured. He was not advised of the important fact that the firm of J. H. Sturdy & Co. were insolvent; that the house and lot of Bennett was unincumbered, and that if attached, it was of sufficient value to pay the debt, nor can he be presumed to have had a lawyer's knowledge of the time that would be requisite to make an attachment, and of the legal effect of it. These were all very material circumstances which should at least have been known to him, before it can be said that he undertook that his principals should be responsible for the debt, if through a delay in delivering the message, the plaintiffs should fail to get the attachment.

The legal obligation of those who publicly engage in the business of transmitting intelligence by means of electric telegraph is, in some of its aspects, to be likened to that of common carriers, but there is a very material difference as to the extent of their liability. In the case of the carrier, the package or property he is to carry is placed in his custody. He has for the time being exclusive control and dominion over it, and necessarily knows if he fails to deliver it, that the value of it will be lost to the person who entrusted it to his care. But those who, like the defendants, undertake to transmit intelligence, do not necessarily know what may be the effect if the message should fail to reach the person to whom it is addressed, and should not be held answerable for all the possible consequences, unless it can be assumed from the circumstances disclosed to them, that they knew exactly what was dependent upon it, and what would be the result in point of damages, if they failed to deliver it.

If thus advised, they understand the extent and nature of the risk they assume, and may protect themselves against the mischances to which all human undertakings are subject, by making a special agreement as to the damages in the event of failure, and at the same time an opportunity is afforded them to require a compensation proportioned to the risk, as well as exercise unusual vigilance; a very material consideration where a heavy liability may depend upon the delivery of a message within a limited point of time. If they are to be

swerable for all the consequences of mischance and failure, they should certainly be informed of all the material circumstances known to the party who avails himself of the facilities they afford, for they cannot be supposed to contemplate the happening of events, unless apprised of the facts which render their occurrence probable or possible.

In *Landsberger* v. *The Magnetic Telegraph Co.* (32 Barb. R., 5·0), the plaintiffs agreed to purchase a quantity of pistols in New York, for a party in San Francisco. The pistols were to be shipped by the steamer of a particular date; the plaintiffs were to have a commission for making the purchase, and were to forfeit five hundred dollars if they failed in performing the agreement. To enable them to execute it, they transmitted ten thousand dollars from San Francisco to New York, one of the plaintiffs expecting to reach New York about the time of the arrival of the money. He was unexpectedly detained, however, upon his route, and that the pistols might be purchased and shipped within the time agreed upon, he sent a telegraphic message from New Orleans to his firm in New York, advising them of what was necessary to be done in the execution of the contract, and informing them where they would get the ten thousand dollars. The telegraph company, in transmitting the message, made a mistake in the name of the plaintiffs' firm, in consequence of which, the message did not reach them until it was too late to perform the contract, whereby they not only lost their commissions, but had to pay the five hundred dollars according to the stipulation in the agreement. It was held that they could not recover either of these items as damages against the company, upon the ground, that as the telegraph company were not informed of the use that was to be made of the money, and of the consequences that would follow a delay in the receipt of it, they could not be presumed to contemplate any other damage from a delay in the delivery of the message except the loss of the interest upon the money, nine dollars and fifty-nine cents, which, with the sum paid for transmitting the message, was held to be all which the plaintiffs could recover.

In the case now before us the clerk may be presumed to have understood that if the message was not delivered immediately, the plaintiffs would lose the opportunity of getting the

Bryant v. The American Telegraph Company.

attachment, but he cannot be supposed to have understood also, that that was the only means left to the plaintiffs for the recovery of their debt, and to have contemplated that if that failed through a delay in the delivery of the message, the plaintiffs would lose twelve thousand dollars, and that his employers would have to pay it. Indeed, I think it may be fairly assumed, that if he had understood that the message was to be delivered immediately under such an onerous responsibility, he would either have declined at that hour of the evening to enter into any such engagement, or if he had entered into it, that he would have exercised extraordinary vigilance, and would have satisfied himself by further communication that it had been duly delivered.

In *Parker* v. *The Alta California Telegraph Company* (13 Cal. R., 422), the defendants, through an accident, delayed for fourteen hours, to send a message, by which the plaintiff's agent was directed to attach a debtor's property for a debt of one thousand eight hundred dollars, in consequence of which delay, other persons obtained attachments, which absorbed the whole of the property. The Supreme Court of California held that the plaintiff might recover from the company the amount of the debt as damages; and they ordered a new trial on that ground. All that I deem it necessary to say in respect to that decision is, that the Court do not support their opinion by any reference to adjudged cases, and that after giving it the respectful consideration to which the judgment of every superior tribunal is entitled, I am not satisfied of the correctness of the reasoning upon which it is founded.

In my opinion, all that the plaintiffs could recover in the present case, was what they paid for transmitting the message, and such expenses as were incidental thereto, and a new trial, in my judgment, should be ordered.

BRADY, J.—The telegram which the defendants undertook to transmit and deliver, was important, and on its face showed that its design was to secure the commencement of legal proceedings against the plaintiffs' debtors by attachment, before the Stonington train entered the State of Rhode Island. The amount of the debt also appeared in the telegram. In addition to this, the defendants' agent " was shown the importance

of it," and he was told that it was to "make an attachment on property," and further, that unless the attachment was made before the Stonington train reached the Rhode Island State line, it would do no good at all. The plaintiffs' attorney not only paid the price asked for the transmission and delivery, but after showing the importance of the telegram, he said to the operator or agent of the defendants : "If there is any extra expense, or likely to be, about sending this dispatch right away I want you to tell me what it is, and I will pay it on the spot." The defendants must be regarded, therefore, as having been advised of the importance of the telegram, and being advised of it, to have contemplated the consequences that might ensue from a failure to transmit and deliver it. The compensation asked for assuming the performance of the service demanded, was paid, and any additional sum was offered, which would be necessary, or likely to become so, to secure the transmission and delivery desired. The defendants cannot avail themselves, therefore, of the principle, that their compensation was not commensurate with the risk incurred, assuming the risk to have been hazardous. It was not so, however. The line was working well—the communication was intact—the operators employed at either end of the route capable, the one of translating and the other of receiving the telegram, and it was transmitted without delay. The mischief done to the plaintiffs was occasioned not by the failure to transmit, but by gross negligence in the delivery of the message at Providence. The case is entirely free from any question of transmission. A few moments' attention would have averted all the loss the plaintiffs have sustained, and the litigation which has sprung up between the parties hereto. If the defendants are held responsible to the extent of the verdict herein, it may be burdensome, or it may be a severe punishment for what seems to be a slight misfeasance when measured by the compensation given. But it must not be forgotten that no fraud was practiced upon the defendants. They were not asked to assume a responsibility not disclosed. The telegram was not only subject to their inspection, but explained in all matters relating to its object and importance. If the administration of justice requires that the judgment pronounced in this case should be maintained, it must be. We have nothing to do with effects. Was the judgment right?

Was the measure of damages erroneous or not? The proof establishes that the attachment, if served, would have been a lien upon the house and lot of Bennett, one of the debtors of the plaintiffs; that it could have been served if the defendants had delivered the telegram diligently after its receipt at Providence; that the house and lot which would have been covered and secured by the lien, was subsequently sold for about the amount of the plaintiff's claim; that the debtor who owned it, and his associates, were insolvent, and went into bankruptcy, and that the debt claimed was due to the plaintiffs. The jury found, in accordance with this proof, and upon these facts the defendants are to be charged, if at all. They could not gainsay these facts, or any of them, and they attempt to shield themselves from the obligation incurred, by the doctrine that the damages claimed are conjectural, and not such as contemplated by the contract when made. Is this true? Let us see what was contemplated by the contract. The telegram and its explanation contemplated an attachment on a house and lot to secure twelve thousand dollars, before the Stonington train entered the State of Rhode Island, otherwise it would do no good, and that unless the telegram could be delivered immediately, the attachment could not be secured. No other suggestion can dawn upon the mind, in view of this information, than that delay might wholly destroy the efficacy of the contemplated process of attachment. "Ascertain in morning if mortgage on the house on record; if so withdraw attachment," a part of the telegram itself, in the absence of explanation, advising the reader that the house and lot referred to would be made available if the process was served, and no mortgage was recorded against the property. In other words, the contract amounts in substance to this—If you deliver that telegram right away I shall secure twelve thousand dollars in all probability; if you do not, I will not send it, because it will do no good. The defendants answer and say, It will be sent at once. The plaintiffs might fail in accomplishing the purpose of the telegram, it is true. Mr. Payne might be absent, leaving no person to represent him, but that would be the plaintiffs' misfortune, and not the defendants' fault. The latter have not shown that the attachment could not have been made—the jury have found that it could. What is there conjectural up-

on these facts in reference to the damages recovered? This is not a case of profits. There is no doubt about the value of the house and lot. The contingency related to the service of the attachment, not to the damages. If that service could be made, then the result of it cannot be doubted. It is established by the evidence and verdict of the jury. That the debtors have not been absolutely and forever discharged from their indebtedness to the plaintiffs, and that at some time, and in some place, in which the discharge obtained may not avail them, they may be able and be compelled to pay, is too conjectural to relieve the defendants of their liability. If the attachment had been served, the plaintiffs would not have been affected either by the bankruptcy or insolvency of their debtors, inasmuch as the property upon which a lien was to be secured was sufficient to pay the debt. There is no evidence to show that a judgment might not have been obtained in that proceeding —none that it is either complicated or difficult. It seems to be a very simple one, and that it could have been successfully prepared and set in motion is established by the jury, and that it would have been successful ultimately, must be inferred from the facts that no defence was shown to the claim, and that judgment was obtained for its amount. The damages shown are, for these reasons, such as may fairly be supposed to have entered into the contemplation of the parties when the contract was made, inasmuch as the defendants were advised of all that was necessary to make the contract appreciable. The importance of the telegram was shown by the plaintiffs' attorney, as already stated, and this could not have been done without explaining the circumstances surrounding the plaintiffs' debtors, the necessity of priority in issuing the attachment, and that it should be served before the Stonington train reached the State line of Rhode Island. In the case of *Parks* v. *Alta California Telegraph Co.* (13 Cal., 422), the defendants were held liable for the amount of the plaintiff's debt, which he had lost in consequence of the negligence of the defendants in sending a dispatch directing an attachment to be served. In that case it appeared that owing to the delay in its delivery, other attachments had been served, and the assets of the defendants exhausted in their application to them, to the exclusion of the plaintiffs' claim, and it also appeared that the defen-

dants were insolvent. The court in that case says : "It seems to us that the loss of the debt would be the natural and proximate damages resulting from the breach of the contract." In *Allen* v. *Suydam* (20 Wend., 321), it was held that where the debt was lost through the negligence of the agent, the measure of damages *prima facie* is the amount of the bill, the defendant being at liberty to show circumstances, if any exist, tending to mitigate the damages, or reduce the recovery to a nominal amount. They have not shown any circumstances or mitigation. There is nothing in the case from which the conclusion may be justly drawn, that any part of the plaintiffs' debt can be collected from their debtors. The insolvency of the latter was sufficient to put the defendants to their proof, and in the absence of proof to the contrary, is conclusive evidence of the loss of the debt, taken in connection with the other facts and circumstances of this case (*Parks* v. *Alta California Telegraph Company, supra*).

For these reasons I find it impossible to resist the conclusion, upon a deliberate consideration of the facts of this case, that the loss of the plaintiffs' debt was the natural and proximate damages resulting from the failure of the defendants to deliver the telegram as agreed upon. It has not been thought necessary to consider the question of subrogation further than to state that the tender of the promissory notes of the plaintiffs debtors to the defendants, have placed the latter in a position to reap all the advantages of the debt.

I think the judgment should be affirmed.

Judge CARDOZO concurred with Judge BRADY.

Judgment affirmed.