# The Western Union Telegraph Co. v. John H. Carew.

*Telegraph Companies, liability of, over their own and other lines: Repeated Messages: Printed Blanks: Special Contract: Agency.* Telegraph Companies, in the absence of any provision of the statute, are not common carriers, and their obligations and liabilities are not to be measured by the same rules, but must be fixed by considerations growing out of the nature of the business in which they are engaged. They do not become insurers against errors in the transmission of messages, except so far as by their rules and regulations, or by contract, they choose to assume that position.

When a person writes a message under a printed notice, requesting the company to send such message according to the conditions of such notice, *held* that the printed blank was a general proposition to all persons of the terms and conditions upon which messages would be sent, and that by writing said message and delivering it to the Company, the party must be held as accepting the proposition, and that such act becomes a contract upon those terms and conditions.

Where a telegraph company established regulations to the effect that it would not be responsible for errors or delay in the transmission of unrepeated messages and for which an increased charge would be made, and further, that it would assume no liability for any error or neglect committed by any other company over whose lines a message might be sent in the course of its destination, *held*, that such regulations were reasonable and binding on those dealing with the company.

Error to Wayne Circuit.

This was an action of assumpsit, brought by defendant in error to recover damages for the failure on the part of plaintiff in error to transmit a certain telegraph message from Detroit to Baltimore. The charges were paid to Baltimore, though plaintiff in error's lines only extended to Philadelphia. The message was correctly sent to Philadelphia, and delivered there to the agent of the Baltimore line. The error occurred between this point and Baltimore.

The message was written upon one of the printed blanks of the company, at Detroit, containing certain conditions, but which defendant in error had never read; neither was his attention ever called to them.

The charge of the court is stated in the opinion. Judgment was rendered for plaintiff below.

*Walker & Kent,* for plaintiff in error.

1. Telegraph companies are in no proper sense common carriers, or indeed bailees of any sort.

Bailment in all its forms, is a contract on the part of the bailee to take some particular thing or person, and deliver again the same thing or person.

The telegrapher receives a certain message, written or spoken, and undertakes, not to convey the identical message or words, but by means of a new and wonderful process to reproduce the same words at another place and to another person. He may neglect or refuse to perform his promise, but the thing received cannot be stolen, cannot be lost.

The ground on which, by the policy of the law, the common carrier is made an insurer, is that the goods entrusted to him, are absolutely in his power, that without danger of detection he might claim that they had been lost or stolen.—1 *Pars. on Cont.,* 634.

The reason of the rule failing as to Telegraphers, it is unjust to apply to them a rule confessedly harsh in its application to carriers.

The reasonable and just rule which should be applied to him seems to us to be the same applied to most other callings. Holding himself out to the public as a telegrapher he should be held to the exercise of reasonable skill in his occupation. He should also be bound to have reasonably good instruments.

He should not be held responsible for mistakes without negligence and from causes beyond his control.

A declaration against him should always aver that he promised to use reasonable diligence and skill; and the breach should be an allegation of neglect.

In this view of the promise implied in law, it is plain that the court below erred in not giving the last request to charge, made by defendant. The declaration averred

an absolute contract to transmit the message to Baltimore. The contract proven was an agreement to use reasonable diligence and skill in sending. Hence, of course, a fatal variance.—2 *Com. Bench*, 7.

· 2. The law imposes upon all telegraph companies the duty of receiving dispatches for ·other lines.—1 *Comp. L.* *p.* 676.

But, from the nature of the case, their contract with the public is only to transmit a message over its own lines, and deliver it to the next line in the course of its journey.—16 *Upper Canada*, 530.

· 3. The contract is a special one. The printed conditions form a part of it :

*a.* The contract was made through an agent. It is well settled that an agent can bind. his principal only when the act in question is within the authority of the agent, or the principal has so acted as to give the party contracting, reason to believe the agent authorized.

In the case at bar, the agent testifies, without contradiction, that he had no authority to receive messages except in accordance with the printed conditions.

*b.* The conditions were general regulations made by the company. They are reasonable regulations, and Carew was bound to take notice of them. If he wanted to send a message he should have inquired on what terms the company sent messages.

*c.* By writing his message upon the company's blank, Carew assented to the conditions written thereon, and is now estopped from denying his knowledge of them. Even though telegraph companies were to be held to the strict rules of a common carrier, still they could make special contracts limiting their general liability.

This doctrine is settled in this state.—6 *Mich.* 243 ; 25 *New York*, 442 ; 5 *H. & N.*, 867 ; 45 *Barb.*, 274 ; 33 *E. L. & Eq.*, 180 ; 18 *Md.*, 341 ; 1 *Metc. Ky.*, 164.

*C. Hunt,* for defendant in error.

It is not claimed that defendant in error ever read the conditions on the printed blanks of the company, or that his attention was ever called to them.

1. The principle is elementary that no party can be bound by an instrument, the contents and conditions of which are concealed, or even if the same were not disclosed by the party benefitted thereby.

Telegraph companies, like common carriers, may limit their liability by a special acceptance when the message is delivered to them, but it must be brought home to the knowledge of those employing them. — 3 *Mich.,* 39; 6 *Id.,* 257.

2. The same rule must apply to telegraph companies that applies to common carriers who receive the whole compensation for the carriage of a package addressed to a place beyond the limits of their own route. That is, that he engages for the due delivery of the package at the place of destination, unless he expressly limits his responsibility to his own route, or the circumstances are such as to clearly indicate that that was the understanding of the contracting parties. — 19 *Wend.,* 534; 25 *Id.,* 660; 8 *M. & W.,* 421; 3 *Sand., S. C.,* 610; 24 *Barb.,* 382; 43 *Id.,* 225; 8 *Pick.,* 23; 5 *B. & P.,* 182; 4 *Dall.,* 206; *Law Reg., May,* 1866, *p.* 414.

3. Where a party assumes to act for another, and where, through his own or his agent's neglect, the interests of the party reposing the trust are damnified, the party assuming the trust shall answer to the party injured. — 12 *Mod.,* 490.

It has been held in numerous cases, both in England and this country, where railway companies were defendants, that where the carriage money was only paid as far as the terminus of defendant's road, and the rest was to be collected on delivery, still the defendants were liable for loss on another and connecting road. — 3 *Eng. L. & E.* 497.

THE WESTERN UNION TELEGRAPH CO. *v.* CAREW.

It has been held in numerous cases that a plaintiff could not recover damages from a connecting line for a loss occuring on such connecting line, on the ground that there was one contract for the entire sum with the original company, and no contract with any of the connecting companies; thus cutting off all redress whatever should these decisions govern, and the proposition affirmed by the plaintiff in error, be correct. — 4 *H. & N.*, 614; 5 *Id.*, 274; 7 *Id.*, 986.

There was no variance between the contract declared upon, and the one proven.

No reference was made to the paper on which the words were written, nor did plaintiff introduce it as part of his proof; he claimed nothing under it, and in fact never had it in his possession after having used it to write the message on. There was nothing contained in it on which plaintiff could sue. It contained no promise on the part of the company to safely and correctly transmit the words thereon written, to Baltimore. The paper contained no undertaking on the part of the company for a breach of which plaintiff could sue. The paper was utterly worthless to him for any purpose whatever. His case was made out by parol proof of the parol agreement, made with plaintiff to send certain words to Baltimore; of the consideration paid therefor; of the failure of the company to transmit the words as agreed, and the damage resulting therefrom.

CHRISTIANCY J.

Carew, the plaintiff below, wishing to order an amount of oysters from Rowe, Schoolfield & Co., of Baltimore, went to the office of the plaintiffs in error, at Detroit, and wrote and delivered for transmission the following message:

"*Rowe, Schoolfield & Co.—Carleton, Baltimore, Md.:*

Send immediately (40) forty cases cans, (5) five sacks kegs. Don't fail.

J. H. CAREW."

and paid for its transmission one dollar and ninety-five cents, the price of an unrepeated message from Detroit to Baltimore.

On the face of the paper upon which the message was written, was printed the following immediately above the written message :

"WESTERN UNION TELEGRAPH CO.—COMMERCIAL MESSAGE.

SEE CONDITIONS ON BACK.

Write plainly. Give full address. Use no abbreviations or figures. Send the following message, without repeating, subject to above conditions and agreement indorsed on back."

On the back of the same paper, in full and clear type, was printed the following :

"WESTERN UNION TELEGRAPH COMPANY.

CONDITIONS.

In order to guard against and correct as much as possible some of the errors arising from atmospheric and other causes appertaining to telegraphy, every important message should be repeated by being sent back from the station at which it is received to the station from which it is originally sent. Half the usual price will be charged for repeating the message. And while this company in good faith will endeavor to send messages correctly and promptly, it will not be responsible for errors or delays in the transmission or delivery, nor for the non-delivery of repeated messages beyond two hundred times the sum paid for sending the message, unless a special agreement for insurance be made in writing, and the amount of risk specified on this agreement, and paid at the time of sending the message. Nor will the company be responsible for any error or delay in the transmission or delivery or for the non-delivery of any unrepeated message beyond the amount paid for sending the same, unless in like manner specially insured, and amount of risk stated thereon and paid for at the time. No liability is assu'' ied for error in' cypher or obscure messages. Nor is any liability assumed by this company for any error or neglect of any other company over whose lines this message may be sent to reach its destination. And this company is hereby made the agent of the sender of this message to forward it over the lines extending beyond those of this company.

"No agent or employee is allowed to vary these terms, or to make any other or verbal agreement, nor any promise as to the

time of performance; and no one but a Superintendent is authorized to make a special agreement. These terms apply through the whole course of this message, on all lines by which it may be transmitted."

The plaintiff below testified — and there was no evidence to the contrary — that he never read the above conditions, nor had his attention called to them — that he was not informed, nor did he know that the message passed over the line of any other Company on its way to Baltimore, or that it was necessary to repeat the message in order to hold the Company responsible for mistakes.

The line of this Company extended only to Philadelphia. The message was correctly transmitted to that point, and there correctly delivered to the agent of the line from Philadelphia to Baltimore. But when received at Baltimore the message read "four cases," instead of "forty," and the four cases only were sent by Rowe & Co. This action is brought to recover the damages resulting from this error.

The court charged the jury:

"1. That the plaintiff was not bound by the conditions on the back of the dispatch, unless his attention was called to them.

"2. That it is immaterial on which line the error occurred; the defendant having received the pay for the proper transmission of the dispatch from Detroit to Baltimore.

"3. That if the plaintiff's attention was not called to the necessity of repeating the message in order to secure its correct delivery, he was not bound so to do, to entitle him to recover."

To each of these charges exception was taken; and the court was requested, but refused, to charge directly the contrary, and that there was a fatal variance between the contract declared upon and that proved (the declaration being upon an absolute undertaking to send to and

deliver the message at Baltimore). If the printed request on the face of the paper, to "send the message without repeating subject to above conditions and agreement on back," together with the terms and conditions referred to, constituted or governed the contract for transmission, then the entire charge of the court was wrong, and the plaintiff below had no right to recover.

The competency of the parties to enter into such a contract is not denied; but it is insisted that telegraph companies are common carriers; that carriers cannot limit their common law liability by a mere notice, because the other party has the right to insist upon having his goods carried by them, subject to their common law liability, notwithstanding the notice; that the parties employing them are not bound to pay any attention to such notice; and to exempt the carrier from such liability it must be shown, not only that the notice was brought home to the party dealing with him, but that he actually assented to the terms.

We do not deem it necessary to discuss the case upon this theory. Our opinion upon its application to carriers will be expressed in the several cases of the Michigan Southern and Northern Indiana R. R. Co., now before us. We are all agreed that telegraph companies, in the absence of any provision of statute imposing such liabilities, are not common carriers, and that their obligations and liabilities are not to be measured by the same rules; that they do not become insurers against all errors in the transmission or delivery of messages, except so far as by their rules and regulations, or by contract or otherwise, they choose to assume that position, or hold themselves out as such to the public, or to those who employ them. The statute of this state, authorizing such companies, and, to some extent, prescribing their duties and liabilities, imposes no such liability.— *Comp. L. Ch.* 70.

Impartiality and good faith are the chief, if not the only, obligations required by the statute so far as relates to the question here involved. Beyond these statute requirements, their obligations must be fixed by considerations growing out of the nature of the business in which they are engaged, the character of the particular transactions which may arise in the course of their business, and the application of the principles of justice and public policy recognized alike by common sense and the common law. The statutes of the other states in reference to this branch of business are in the main substantially like our own.

Telegraph companies, like common carriers, it is true, exercise a public employment, and the former are bound to send messages for those who apply, and are ready to pay the usual or settled charges, as the latter are bound to transport goods for those who seek their services upon similar terms; and doubtless the same rules for securing impartiality would apply to both, except as modified by statute — *see Section* 15 *of Chapter* 70, *above cited.* But beyond this, as relates to the actual transportation of goods in the one case, and the transmission of ideas in the other, there is, in the nature of things and the different means and agencies employed, but very little substantial resemblance; and any analogy must be more fanciful than real, and likely to lead to error and injustice. This is not a case which calls upon us for laying down the rules, which must be held to govern as to the degree of skill, care and diligence to be required in the transmission of messages. But doubtless the use of good apparatus and instruments would be required, and reasonable skill, and a high — perhaps the very highest — degree of care and diligence in their operation. And when an error has occurred in the transmission of a message, it may be found that they ought to be held *prima facie* guilty of negligence, the *onus* of proof resting

upon them to show diligence, the means for doing this being peculiarly within their knowledge and power.

But it would be extremely unjust, and, considering the small amount of compensation for sending a message, would effectually put an end to. this method of correspondence, to hold them absolutely liable as insurers for the entire correctness of all messages transmitted, or to hold them responsible for all damages which might accrue from an error, especially when only a single transmission without repeating, is relied upon or paid for; or, to deny them all power by rules, regulations or notices to *limit* their liability even in the case of repeated messages. And it would be equally unreasonable to require them to repeat a message when they are paid only for a single transmission.

And while, in settled weather, or, when the normal condition or operation of the electrical currents is not affected by any temporary or local disturbance, a single transmission by a skillful operator may be relied upon, as a *general rule*, and for matters of comparatively small importance, yet it must be well known to most men (if. not to all who have such a degree of intelligence as to be likely to resort to this mode of correspondence), that the electrical state of the atmosphere is liable to sudden and violent changes, extending over areas of greater or less extent, which cannot be foreseen or guarded against, and which materially affect the currents transmitted from a battery along the wires, and for a time render the operation of the instruments uncertain and unreliable; that these disturbances often affect distant portions of the line or of a connecting line, while their influence may be scarcely felt or not felt at all at the station from which a message is sent, and that therefore to insure entire and uniform correctness, the only safe method is to have the message verified by repeating it back to the station from which it was sent.

The regulation therefore of most, if not all telegraph companies operating extensive lines, allowing messages to be sent by single transmission for a lower rate of charge, and requiring a larger compensation when repeated, must be considered as highly reasonable, giving to their customers the option of either mode, according to the importance of the message, or any other circumstance which may affect the question.

And as the compensation ought always to be in proportion to the risk assumed, the provision in these regulations in reference to insurance, must be regarded also as just and reasonable.

As the statute of this state (and of the other states so far as we have examined them) requires them to receive dispatches from and for other telegraph lines, and to transmit, etc., it is but reasonable, when the same message is to pass over the lines of more than one company, that each should be responsible only for the errors occurring on its own line; and the receipt of the money by the company first transmitting the message, as the agent of the other lines, is much more for the convenience of the person sending the message, than for that of the company.

Such being the reasonable and settled rules, regulations and usage of this company, it was, we think, for the plaintiff, before sending his message, to acquaint himself with those rules, regulations and usages, and the terms upon which messages would be sent. And in the absence of any special inquiry by him upon the subject, the natural inference would seem to be, either that he already knew and assented to such rules, regulations or usages, or that he intended to assent to them whatever they might be.

But to give to all who should wish to send messages full information upon these matters, in an authentic and reliable form, which could not so well be done verbally

by special explanations to each applicant, this company has very properly printed their rules and regulations upon the very paper upon which each message is to be written; and upon the very face of the paper immediately preceding the blank space on which the message is written, is the printed request to send the message "subject to above conditions and agreement indorsed on back." The signature of the message becomes also an adoption of, and signature to this request. The party sending the message fills up and signs the printed blanks; and, in form, at least, it is as much his contract as if he had written the whole printed conditions or a contract in which they were inserted with his own hand.

This printed matter on the face of the paper could hardly escape the attention of any one not naturally or purposely blind, who should write a message upon the paper. He must at least know that there is some printed matter on the face of the paper, and he must be held to know that it has been placed there for some purpose connected with the message. It is therefore no excuse for him to say he did not read this printed matter before his eyes. It was gross carelessness on his part if he did not.

The printed blank, before the message was written upon it, was a general proposition to all persons of the terms and conditions upon which messages would be sent. By writing the message under it, signing and delivering it for transmission, the plaintiff below accepted the proposition, and it became a contract upon those terms and conditions. *Breese v. United States Telegraph Co.,* 45 *Barb.,* 274, a parallel case, in all material respects, with the reasoning of which we are fully satisfied. See also *Lewis v. Great Western Railway Co.,* 5 *H. & N.,* 867; *Bryant v. Telegraph Co.,* 1 *Daly,* 578; *McAndrews v. Telegraph Co.,* 33 *Eng. L. and Eq.,* 180.

The conditions on the back of the message, it is true, did not state where the line of this company terminated,

nor what other line the message must pass over. But the reference to the terms of sending over other lines, was sufficient, if the plaintiff deemed it of any importance to him, to put him upon enquiry, when the fact would at once have been ascertained.

The contract, which the evidence tended to show, was for a single transmission by the company over its own line without repetition, and for delivering the message as the agent of the plaintiff to the next line in its course to Baltimore; a contract which the evidence tended to show had been fully complied with. The contract, therefore, was essentially different from that declared upon. The charge was erroneous upon all the points stated in the record.

The judgment must be reversed, with costs, and a new trial awarded.

CAMPBELL and COOLEY JJ. concurred.

MARTIN CH. J. was not present.