No. 643.

## BIERHAUS ET AL. *v.* THE WESTERN UNION TELEGRAPH COMPANY.

TELEGRAPH COMPANY.—*Message.*—*Legal Transaction.*—*Negligence in Transmission and Delivery.*—*Special Damages.*—If a telegraphic message show that it relates to a commercial or legal transaction of value, it is sufficient to apprise the company of its character, and, for failure to use due diligence, it must respond in all special proximate damages.

SAME.—*Message.*—*Legal Transaction.*—*Damages.*—Where a telegram has been negligently and unnecessarily delayed, either in transmission or delivery, and thereby the collection of a debt has been defeated or rendered improbable, a substantial injury has been sustained for which special damages may be recovered.

SAME.—*Knowledge by Company of its Inability to Promptly Send Message.*—*Duty of.*—*Liability.*—Where a telegraph company receives a message for transmission, knowing at the time of its inability to transmit the message promptly, and does not so inform the sender, the company will be held responsible for any damages flowing from a delay in the transmission of the message.

SAME.—*Telegram.*—*Free Delivery.*—*Limitation to Certain Hours.*—*Knowledge of by Sender.*—*Liability for Delay.*—Where a telegram is received for transmission and delivery, and the sender is informed of a rule at the office of destination that free delivery of telegrams will not be made beyond a certain hour in the day, until the succeeding day, the company will not be responsible for any damages resulting from a delay in delivery, in compliance with such rule and custom.

EVIDENCE.—*Law of Foreign State Not Pleaded.*—*When May be Shown by Parol.*—Where a plaintiff seeks to establish his cause of action by showing the loss of a remedy in a foreign State, by defendant's negligence, the existence of the remedy under the laws of such foreign State may be shown, without pleading the law of such State.

From the Knox Circuit Court.

*W. A. Cullop* and *C. B. Kessinger*, for appellants.

*J. S. Pritchett, J. T. Beasley* and *A. B. Williams*, for appellee.

LOTZ, J.—The appellants sued the appellee to recover

damages alleged to have been sustained on account of the negligence of the appellee in transmitting and delivering two telegraphic messages. Issue was joined; there was a trial by jury, and a verdict for appellants in the sum of fifty cents. The court rendered judgment in favor of appellants for fifty cents damages and fifty cents costs.

The errors assigned in this court are:

1. The overruling of the demurrer to the second paragraph of amended answer.

2. The motion for a new trial.

If the appellants, in the court below, secured a judgment for all the damages recoverable under the allegations of their complaint, then they can have no valid grievance to present to this court; for where the ultimate judgment is right, no intervening error will avail in securing a reversal. *Morrison* v. *Kendall,* 6 Ind. App. 212, 33 N. E. Rep. 370; *Hamilton* v. *City of Shelbyville,* 6 Ind. App. 538, 33 N. E. Rep. 1007.

The first question presented for our consideration is whether or not special damages can be recovered under the allegations of the complaint. If only nominal damages and the sum paid for the transmission of the messages can be recovered, then appellants have no cause for complaint, for the court below meted out to them all they were entitled to recover.

The substantial allegations in that paragraph of the complaint upon which the judgment is founded are as follows:

"That the appellants were wholesale grocers and jobbers, doing business in Vincennes, Indiana, by the name of E. Bierhaus & Sons, and did business throughout that part of the State of Indiana and the adjoining State of Illinois; that they employed traveling salesmen and clerks, who solicited business for them, and they

had many customers at various places in both of said States; that on the 22d day of July, 1890, and long prior thereto, they did business at Mt. Carmel, Illinois; that among their customers at said place was one P. L. Davis, who was indebted to them in the sum of $161.15; that the appellee had a line of wire extending directly from Mt. Carmel to Vincennes, a distance of twenty miles, and was engaged in telegraphing for the public generally; that on said day appellants had in their employ one M. F. Hoskinson, a competent and practicing attorney at said Mt. Carmel, who was authorized by them to make collections for them; that on said day said Davis was the owner of a stock of goods and merchandise situate in said Mt. Carmel; that on said day, at about the hour of three o'clock P. M., said Hoskinson learned and ascertained that said Davis was disposing of his stock of merchandise and converting his property into money, and preparing to leave the State of Illinois without paying his debts, and especially appellants' debt, and said Hoskinson thereupon prepared and delivered to the appellee, at its office in Mt. Carmel, directed to appellants, in their firm name, at 3:30 o'clock P. M. on said day, for transmission, the following message: 'Have you claim against P. L. Davis? Answer how much.' That the defendant then and there accepted said message and agreed to transmit the same; that said message was for the use and benefit of appellants; that said telegram was not delivered to appellants until the hour of 8:05 o'clock P. M. of said 22d day of July, four hours and thirty-five minutes after the same was delivered to appellee for transmission; that as soon as appellants received said message, they at once prepared an answer thereto and delivered the same to appellee at its office in the city of Vincennes, addressed to said Hoskinson, and requested appellee to transmit the same to Mt. Carmel,

which said answer was as follows: "Yes. One hundred and sixty-one dollars and fifteen cents." That appellee then and there accepted and agreed to transmit the same for and in consideration of the sum of twenty-five cents, which appellants then and there paid to appellee; that said telegram arrived at Mt. Carmel at 8:40 o'clock P. M. of said day, but was not delivered to said Hoskinson until 9 o'clock A. M. of the 23d day of July, 1890; that before said telegram was delivered, the said Davis had disposed of all his property and converted the same into money and left the State of Illinois, and appellants' debt could not then be collected from him; that said Hoskinson was a resident of the city of Mt. Carmel; that he was then the judge of the County Court of Wabash county, and his residence and place of business was well known, and he lived near appellee's office, and could have been easily found; that appellee well knew that Hoskinson was looking for an answer to his said message, as he went to appellee's office at 8 o'clock P. M. of said 22d day of July and inquired for an answer to his telegram; that immediately after said Davis sold his property, he departed from the State of Illinois for parts unknown to appellants, and has ever since kept his whereabouts unknown to them; that if said message from said Hoskinson to appellants had been promptly transmitted and delivered, appellants would have responded at once, and if the telegram to said Hoskinson had been promptly delivered, appellants could have made and collected their debt due them from said Davis; that on account of appellee's negligence in transmitting and delivering said messages, appellants have lost the debt due them from Davis, and they were prevented from collecting the same, and have lost said debt, together with a fee of $20 which they became liable to pay to said Hoskinson."

Appellee contends, that there is nothing in the first message to apprise it of the importance of speedy transmission; that there is nothing in either of them that acquaints it of the fact that appellants desired to institute legal proceedings; that the first message may have been no more than an idle inquiry, or that Hoskinson may have wanted the information for various purposes other than legal proceedings; that it was not notified of the importance of either message, and that, therefore, no special damages can be recovered.

The transmission of information from one point to another, by means of electrical wires, is of comparatively recent origin. When persons and corporations first began to transmit such messages for hire, the courts applied to them the same rules that governed common carriers. There is little analogy between the two methods of doing business. The carrier transports the thing itself, while in telegraphy the information is not actually transported at all, but is conveyed by means of a continuous wire and electrical appliances. A language is spoken at one end which an educated and skillful operator understands and interprets at the other. The tendency has been to apply old rules to new inventions and methods.

In the celebrated case of *Hadley* v. *Baxendale*, 9 Exch. 341, it appeared that the plaintiff, owner of a steam mill, broke a shaft, and desiring to have another made, left the broken shaft with the defendant, a *carrier*, to take to an engineer to serve as a model for a new one. At the time of making the contract, the defendant's clerk was informed that the mill was stopped and that the plaintiff desired the broken shaft sent immediately. Its delivery was delayed and the new shaft kept back, as a consequence. The plaintiff brought an action for a breach of the contract with the carrier, and claimed, as

special damages, the loss of profits while the mill was kept idle. But because it was not made to appear that the defendant was informed that the want of the shaft was the only thing that was keeping the mill from operating, it was held that he could not be made responsible to the extent claimed.

The reason for this rule is that the defendant not having any knowledge of one element of the damages sought, at the time he made the contract to carry the shaft, he could not be held to have contracted with reference to such possible resultant consequences.

Until recently, American judicial authority has been generally agreed that the rule for the measure of damages here laid down governs in all cases for the failure to transmit and deliver telegraphic messages correctly and promptly. That is to say, the company which undertakes to transmit the message must be apprised by the sender, or by the terms of the message itself, of the probable resultant consequences flowing from the failure to transmit and deliver promptly; that unless it has knowledge of such probable consequences it can not be said to contract in reference thereto. *W. U. Tel. Co.* v. *Hall*, 124 U. S. 444; *W. U. Tel. Co.* v. *Cooper*, 71 Tex. 507, 10 Am. St. Rep. 772, note. Many cases might be cited in support of this rule. In some of the more recent decisions, the tendency is to relax this rule, and some courts have gone so far as to entirely overthrow it.

In *Daugherty* v. *Am. Union Tel. Co.*, 75 Ala. 168, 51 Am. Rep. 435, it was held that the company was liable for special damages for the nondelivery of a cipher message, the meaning of which was not known or explained to the company's agent. So it has also often been held that the company is liable for all proximate damages where the message is couched in language the meaning of which is obscure, or unknown to the com-

pany's agent. The courts are inclined to adopt the principle that it is sufficient to render the company liable for actual damages if the message show upon its face that it relates to a business transaction, and that loss will probably result unless it is promptly and correctly transmitted and delivered, and that it is not necessary that the company be apprised of the loss that may result from its default. If the message show that it relates to a commercial or legal transaction of value, it is sufficient to apprise the company of its character, and for failure to use due diligence it must respond in all special proximate damages.

The following are some of the cases where the principle has been applied, messages as follows: "Cover two hundred September, one hundred August." *W. U. Tel. Co.* v. *Blanchard,* 68 Ga. 299, 45 Am. Rep. 480. "Ten cars new two whites Aug. shipment fifty six half." *W. U. Tel. Co.* v. *Harris,* 19 Ill. App. 347. "Sell one hundred Western Union. Answer price." *Tyler* v. *W. U. Tel. Co.,* 60 Ill. 421. "Ship hogs at once." *Manville* v. *W. U. Tel. Co.,* 37 Iowa 214. "Ship cargo at 90 if you can secure freight at 10." *True* v. *International Tel. Co.,* 60 Me. 9. "If we have any Old Southern on hand sell same before board. Buy five Hudson at board." *Rittenhouse* v. *Independent Line, etc.,* 44 N. Y. 263. "Will take two cars sixteen; ship soon as convenient, via West Shore." This was in response to the following: "Pickled hams sixteens nine and a half." *Mowry* v. *W. U. Tel. Co.,* 51 Hun, 126. "Buy fifty Northwestern—Fifty Prairie du Chien, limit forty-five." *U. S. Tel. Co.* v. *Wenger,* 55 Pa. St. 262, 93 Am. Dec. 751. "Car cribs six sixty c. a. f. prompt," sent in reply to the following: "Quote cribs loose and strips packed." *Pepper* v. *Telegraph Co.,* 87 Tenn. 554. "Send bay horse to-day; Mack loads to-night." *Thompson* v. *W. U. Tel. Co.,* 64 Wis. 531.

In the well considered case of *Postal Tel., etc., Co.* v. *Lathrop*, 131 Ill. 575, after reviewing many authorities bearing on this question, the court concludes as follows: "We think the reasonable rule, and the one sustained by authority, is, that where a message, as written, read in the light of well known usage in commercial correspondence, reasonably informs the operator that the message is one of business importance, and discloses the transaction so far as it is necessary to accomplish the purpose for which it is sent, the company should be held liable for all the direct damages resulting from the negligent failure to transmit it as written, within a reasonable time, unless such negligence is in some way excused."

No court has gone farther in this direction than the Supreme Court of Indiana. In the case of *Hadley* v. *Western Union Tel. Co.*, 115 Ind. 191, the telegram read as follows: "Want your cattle in the morning; meet me at pasture." The message was sent on the 14th day of October, but was not delivered until the morning of the 15th, at about the hour of seven o'clock. It seems that the cattle had been sold for future delivery, at the option of the purchaser, and the purpose of the message was to notify the seller to deliver the cattle at a certain time. It was the custom among stock dealers to take and weigh cattle at early daylight. On account of the failure to deliver the message promptly, the cattle were detained in a public highway for the space of thirty or forty minutes before they could be weighed; and on account of such detention and delay, they decreased in weight. It was held that the company was liable for the decrease in weight, although there was no showing that the company's agent was notified of the importance of the message, or that he had any knowledge of the sale of the cattle, or of the custom among stock dealers, or that the cattle were liable to decrease in weight by not being

weighed immediately after rising in the morning. It is hard to reconcile some of the holdings with the general rules that prevail in measuring the damages in the cases of a breach of contract. A person in making a contract has the right to protect himself against liability by proper stipulation, and it is manifestly unjust to compel him to respond in damages for consequences which were unknown, and not even contemplated by him.

Telegraph companies when they are incorporated have certain extraordinary privileges granted to them by the State, and the State has the right to impose duties upon them. Accordingly they are required to receive and transmit dispatches with impartiality and in good faith, under a penalty for failure so to do. Elliott's Supp., section 1120. They are also made liable for special damages for failure or negligence in receiving, transmitting and delivering messages. Section 4177, R. S. 1881. Most all the States have similar enactments. It seems to us that it is more logical to say that there are duties imposed upon the company by law, and that for the breach of these duties it is liable for all the damages that naturally and proximately result from the breach of the duty, and not from the breach of a contract.

The appellee further contends that the complaint does not show that the appellants have lost any legal remedy; that they may still pursue the said Davis by legal process or otherwise, and collect their debt. If, however, the collection of their debt has been defeated or rendered improbable by the neglect of the appellee, we think the appellants have sustained a substantial injury. In *Parks* v. *Alta California Tel. Co.*, 13 Cal. 73, Am. Dec. 589, the plaintiffs, in reply to a message from their agent, informing them of the failure of a certain firm, and inquiring the amount due, sent the following: "Due, 1,800; attach if you can find property. Will send

note by to-morrow's stage." The message was delayed through the negligence of the defendant's agent, and, when it reached its destination, all the property of the firm had been attached by other creditors, and the plaintiff's claim was wholly lost. The loss of the debt was held to be the natural and proximate damages resulting from the defendant's negligence.

In *W. U. Tel. Co.* v. *Sheffield*, 71 Tex. 570, 10 Am. St. Rep. 790, the message read as follows: "You had better come and attend to your claim at once." The delivery of the message was delayed by the negligence of the company, so that other creditors attached and obtained first liens upon the property of the debtor. It was held that the measure of damages was the value of the debt with interest to the date of trial, and the costs of the message. The same principle was applied to similar circumstances in *Bryant* v. *Am. Tel. Co.*, 1 Daly 575. The complaint states a case which entitles the appellants to recover special damages.

The first part of the amended second paragraph of the answer is addressed to the first message, and is designed to excuse the appellee from promptly transmitting the same. The facts upon this point, alleged in brief, are, that said message was delivered to appellee's agent at Mt. Carmel at the hour of 5:10 o'clock in the afternoon of July 22, 1890, and at that said time, and for several hours just previous thereto, a severe storm was raging at Mt. Carmel, Ill., and along the route over which the wires extended between Mt. Carmel and Vincennes, and such storm continued with great violence for the period of three hours after said message had been delivered for transmission; that during all of said time the air was so charged with electricity, and the wires so affected thereby, that it was impossible to transmit such message over such wires, and said wires were thrown down and broken

by trees falling upon them; that as soon as said storm abated the message was, at the earliest possible moment, transmitted and delivered.

Appellants assert, that these facts do not show a sufficient justification for the delay; that no one but a skilled electrician or telegrapher can determine what storms affect the wires so that a message can not be sent over them, and that none but the agents of the company could know that the wires were broken at remote points; that when the company received the message it knew of these facts, and appellants' agent did not; that when it accepted the message and money for transmission, if it failed to inform appellants of its inability to transmit, at once, that its liability became fixed from that moment; that had appellants known of the inability, they might have availed themselves of other means of communication, and thus have secured their debt.

The statute, section 1122, Elliott's Supp., requires telegraph companies to receive messages. They have no option to refuse them, except upon payment of a penalty. The law does not require of them impossible or unreasonable things. If a message can not be transmitted by reason of storms or other atmospheric influences, the company will be excused. *Western Union Tel. Co.* v. *Cohen*, 73 Ga. 522.

If the delay in transmitting a message is caused by conditions beyond the control of the company, it can not be compelled to respond in damages. *Beasley* v. *Western Union Tel. Co.*, 39 Fed. Rep. 181.

If, at the time the message is received, the company's agents have no knowledge that the wires are in such a condition that the message can not be transmitted, or if, after it is received, conditions arise which render it impossible to transmit it promptly, it will be excused. *Fowler* v. *Western Union Tel. Co.*, 15 Atl. Rep. 29.

But the case made by the answer does not fall within these rules. It is shown that at the time the message was received, the company's agent knew of its inability to transmit the message promptly, by reason of the electrical storm and its broken wires. There is no showing that the appellants had knowledge of these conditions, or that the company's agent gave them any such information. It is true that appellants knew that a storm was raging, but it surely will not be contended that every storm so affects the wires that messages can not be transmitted, nor that every storm causes trees to fall over and break the wires. The law requires, that the company shall deal with the public in good faith; that each party should be placed on an equal footing. It is manifestly unfair for the company to receive the message knowing that its wires are broken, and that an electrical storm is raging which renders it impossible to transmit promptly, and keep such knowledge locked up from the sender. Persons resort to telegraphy because of its rapid communication, and pay exorbitant prices for the service because it is rapid. If the company knows that it can not give quick communication, when the message is accepted, it can not excuse itself except by notifying the person presenting the message of its inability. Suppose there were several lines between the same points, operated by different companies, and that one of the lines is broken and can not be repaired for several hours, and these facts are known to the company only. A message is presented and accepted and no notice of inability is given. A delay of several hours ensue, and great damages are incurred. Would it be contended that the company would not be liable when, if it had communicated its inability, the message might have been sent by another line, and the loss avoided?

So, in this case, if appellants had been informed of appellee's inability, they might have made the communication by other means. They were only half an hour away by rail or two hours by courier. We think this part of the answer insufficient.

The second part of the answer relates to the failure to deliver the second message promptly. It is averred, that this message was delivered to appellee's agent, at Vincennes, Ind., at 8:30 o'clock P. M., of July 22d; that it was promptly transmitted to its office in Mt. Carmel, where it was received at 8:40 o'clock of the same day; that on said day, and for a long time prior thereto, there was a general rule and regulation in force at said office to the effect that if any message was received after 8 o'clock P. M. of any day, such message would not be delivered by messenger of appellee away from said office, and that such message would only be delivered on the day of reception, unless the person to whom such message was addressed employed a special messenger to make such delivery; that such custom was general and uniform at said office and place, and was well known and understood by the citizens and inhabitants of said Mt. Carmel and vicinity; that when the said M. F. Hoskinson, mentioned in the complaint, delivered the first message, referred to in the complaint, he was fully informed as to said rule and regulation, and was then notified by appellee's agent that if an answer should be received to said message after the hour of 8 o'clock P. M. of said day, the same would not be delivered away from the receiving office until the following day, unless a special messenger was employed to make such delivery; that no such messenger was employed, and that appellee delivered the same promptly on the next day. Appellants contend that these facts do not excuse the appellee for the negligence imputed to it for a failure to deliver the

second message, because it is not shown that when they sent the message from Vincennes they had knowledge of, or were informed of the regulation at Mt. Carmel. It is well settled that a telegraph company may reasonably regulate its office hours, and its free delivery limits, according to the requirements of the business at the various points where it holds itself out for public service. It is not the regulation that is complained of here, but the failure of the company to notify appellants of the existence of such regulation.

In *Western Union Tel. Co.* v. *Harding*, 103 Ind. 505, which was an action to recover a statutory penalty, it was held that a telegraph company is not required to keep its agents informed concerning the office hours at all other points, so that when a message is presented for transmission the sender may be apprised of any probable delay which may intervene at the other end of the line. This decision, however, was not unanimous, and it was expressly limited to cases for the recovery of a penalty. The intimation, however, is that in a case to recover special damages such regulation, without being communicated to the sender, would not exculpate the company from liability. MITCHELL, J., said: ''It might well be that in a case where a message was delivered, which showed upon its face the importance of speedy transmission, and other means of making the communication were available to the sender, which might be resorted to if he was informed that the one chosen was ineffectual, or his conduct might otherwise be materially controlled thereby, the company would be bound, at its peril, to ascertain and disclose its inability to serve him, or render itself liable to respond in damages.''

In *W. U. Tel. Co.* v. *Broesche*, 72 Tex. 654, it was decided that a telegraph company could not relieve itself from liability for failing to deliver a message paid for

and sent by it, by showing that its office at the point of delivery was closed when the message was received for transmission. A telegraph company had an office regulation at Hannibal, Mo., which confined the free delivery of messages in that city to within a radius of ten blocks. "It would, in our opinion, be quite unreasonable to expect the plaintiff to be advised of such a regulation. It would be much more reasonable to require the defendant's agent to notify the sender of a message of the free delivery limits applicable only to the place of destination." *Brashears* v. *W. U. Tel. Co.*, 45 Mo. App. 433. There are authorities which take a contrary view of this question. *W. U. Tel. Co.* v. *Henderson*, 89 Ala. 510; *Stevenson* v. *Montreal Tel. Co.*, 16 U. C. Q. B. 530; *Given* v. *W. U. Tel. Co.*, 24 Fed. Rep. 119.

In the case last cited, Mr. Justice MILLER said: "Nor do we see that it is the duty of the Western Union Telegraph Company to keep the employes of every one of its offices in the United States informed of the time when every other office closes for the night. The immense number of these offices all over the United States, the frequent changes among them as to the time of closing, and the prodigious volume of a written book on this subject, seem to make this onerous and inconvenient to a degree which forbids it to be treated as a duty to its customers, for neglect of which it must be held liable for damages." We do not concur in the statement that onerous and burdensome conditions would be imposed upon the company if it were required to inform its customers of the office hours and delivery limits at the delivery office. It is a well known fact that such companies have rate books, with the names of the stations alphabetically arranged, which its employes frequently resort to before they accept a message. By a proper designation, the office hours and delivery limits of each sta-

tion could be readily indicated. Such methods are applied in the postal service.

Mr. Thompson, in his work on Electricity, section 300 says: "But it is a mere judicial assumption to say, as was said in one case (*Givens* v. *Western Union Tel. Co., supra*) that the employes in a telegraph office are not required to know the hour at which an office of the company in another city closes. On the contrary, it is an obvious suggestion that, in any properly regulated telegraph system, the offices would be classified, and there would be a uniform time established for the closing of those of each class, of which time every agent receiving dispatches would be apprised. It is probable that there is not a receiving agent in the postal telegraph service of France or Germany that does not know the hour of closing of every office in the republic or empire."

The averment here, however, is that the appellee informed appellants' agent at Mt. Carmel, before the second message was sent, of the existence of such regulation. As he was specially entrusted with the management of the business at that end of the line, his knowledge must be deemed the knowledge of his principals. *Brannon* v. *May*, 42 Ind. 92; *Phœnix Mut. Life Ins. Co.* v. *Hinesley*, 75 Ind. 1.

That part of the answer that is addressed to the failure to promptly transmit and deliver the first telegram is insufficient, and that part that is addressed to the failure to promptly deliver the second telegram is sufficient; but as the pleading attempts to answer the whole complaint, the demurrer should have been sustained.

On the trial of the cause, the appellants produced a witness, M. F. Hoskinson, who testified that he was a resident of Mt. Carmel, Ill., and had been practicing law for fourteen years and was then the county judge. Appellants then offered to show by him, that he could have

sued out, under the laws of Illinois, a writ of attachment and attached sufficient property of the said Davis to have made the whole of appellants' debt had said message been promptly delivered; that he, as the attorney for appellants, could have given bond and made the affidavits for a writ of attachment and garnishment. The appellee objected to this testimony, assigning as a reason for its inadmissibility that no statute of Illinois had been pleaded.

The court excluded this testimony, and, among other things, said, in the presence of the jury, that no statute of Illinois had been pleaded. To these remarks of the court in the presence of the jury, the appellants, at the time, excepted. The court seems to have based its ruling upon the theory that it was necessary to plead the statute of a foreign State, before it could be given in evidence.

The general rule is that where a party relies upon the statute of a foreign State to give him a right of action or ground of defense, he must specially plead and prove the statute. The right of action declared upon in plaintiffs' complaint is not given by a foreign statute. The right to recover damages for failure to promptly transmit and deliver a telegraphic message exists independently of any statutory enactment, but such right is specially given by section 4177, *supra*.

The statutes of Illinois, if they were proper for any purpose in this case, were only evidence tending to establish appellants' right of recovery. It is a familiar rule that a party is not required to plead his evidence. The laws of a State to whose courts a party appeals for redress, furnish, in all cases, *prima facie*, the rule of decision, and if either party claims the benefit of a different rule, as applicable to his case, he must aver and prove it. *Buchanan* v. *Hubbard*, 119 Ind. 187.

In *Crake* v. *Crake*, 18 Ind. 156, it was said: "Where a right is sought to be enforced in one State in relation to a subject-matter existing in a foreign State, and no foreign law is proved, and no common law rule ever prescribed, and no contract exists, * * * the court will apply the law of the State in which it is sitting."

The law of the sister State of Illinois, both statutory and common, in the absence of any showing to the contrary, is presumed to be the same as that of our own State. *Hynes* v. *McDermott*, 82 N. Y. 41; *Desnoyer* v. *McDonald*, 4 Minn. 515; *Cooper* v. *Reaney*, 4 Minn. 528; *Lewis* v. *Bush*, 30 Minn. 244; *Draggoo* v. *Graham*, 9 Ind. 212.

It would seem, under these rules, that the appellants were under no compulsion to prove the statute laws of Illinois, but that they might rely upon the laws of Indiana without proof. Lawson's Expert and Opinion Evidence, p. 59.

If the appellee desired to invoke a foreign rule, the burden rested upon it to overthrow the presumption.

We may say, *en passant*, that the unwritten or common law of any other of the United States or of England may be proven by parol by persons learned in such laws. Section 476, R. S. 1881.

In England, this rule extends to the written as well as the unwritten laws.

In Baron De Brode's Case, 8 Q. B. 208, a French advocate practicing at Strasburg was permitted to depose that the feudal law had been put an end to in Alsace by the "torrent of the French Revolution" and by a decree of the national convention. This rule has been followed in that country ever since, but the American rule is less liberal. It requires the production of the written law, but will hear parol evidence of experts as to its interpretation and effect.

Section 477, R. S. 1881, provides that "The existence and tenor or effect of the laws of any foreign country may be proved as facts by parol evidence; but if it shall appear that the law in question is contained in a written statute or code, the court may, in its discretion, reject any evidence of such law which is not accompanied by a copy thereof."

The appellants were surely entitled to show that they could have given bond and procured writs of attachment and garnishment and secured their debt, under the statutes of Indiana, without pleading the statutes of Illinois.    It is not necessary to prove the law of the forum. Lawson's Expert and Opinion Evidence, p. 59.

Judgment reversed, with instructions to sustain the motion for a new trial and the demurrer to the amended second paragraph of answer, and for further proceedings in accordance with this opinion.

Filed June 20, 1893; petition for a rehearing overruled Nov. 23, 1893.