N. M. CORDELL and wife v. WESTERN UNION TELEGRAPH COMPANY.

(Filed 9 December, 1908).

1. Telegraph Companies—Duty to Public—Message Tendered.

A telegraph company owes a duty to the public, within the scope of its business, to receive for transmission and delivery, under its reasonable rules and regulations, a proper message tendered with lawful charges for such service.

2. Same—Refusal to Receive—Tort.

For the wrongful refusal by telegraph company to receive, for transmission and delivery, a message tendered, an action in tort accrues to the party injured.

3. Telegraph Companies—Message Tendered and Refused—Torts—Measure of Damages.

In an action arising in tort against a telegraph company for the wrongful refusal to receive a message for transmission and delivery, the damages recoverable are all such as proximately flow therefrom, and are not limited to those within the contemplation of the parties.

4. Telegraph Companies—Message Tendered and Refused—Lawful Messages—Destination—Signature—Implied Knowledge.

After having been sent back some twelve miles in the country by the defendant telegraph company's agent to have a message,

CORDELL *v.* TELEGRAPH CO.

formerly tendered and refused, written on defendant's blank used for the purpose, the agent of the sender tendered, with charges for transmission and delivery, two messages written thereon, addressed to D., to tell C. (her husband) of the dangerous condition of his child, and to come at once. The defendant's agent had refused the first message, giving as his reason he did not know its destination, and had been informed that it was in the country some miles from its two telegraph offices, S. and B. The full charges for transmission and special delivery were tendered, and defendant's agent roughly refused to receive them because the place of destination of each were signed to the message, the sender's signature being omitted, instead of at its usual placing on the forms furnished. *Held,* (1) The messages were lawful ones; (2) They were sufficient to apprise the defendant's agent that they were for transmission to S. and B.; (3) The absence of the signature of the sender gave no indication of an unlawful design or purpose; (4) That they gave notice that the failure to send them would cause mental anguish.

5. Telegraph Companies—Address to Third Persons—Principal and Agent—Questions for Jury.

The evidence showing a wrongful refusal by telegraph company's agent to receive, for transmission and delivery, a message addressed to a third person, requesting him to inform plaintiff's husband of the dangerous condition of his child and for him to come at once, and it appearing that the addressee could readily have given the information to plaintiff in time for him to reach home before the burial of his child, it is for the jury to find whether the addressee as agent of plaintiff would have communicated the information to the husband.

6. Telegraph Companies—Time of Burial—Evidence.

Evidence of the time of burial of the person concerning whose illness a telegram has been offered to defendant to send, may be competent in an action for mental anguish arising from the wrongful refusal of defendant to receive it for transmission.

7. Telegraph Companies—Sickness in Plaintiff's Family—Evidence Immaterial.

In an action upon tort for the wrongful refusal of a telegraph company to receive a message for transmission, announcing an illness of a child, evidence of the number of, or the sickness in, plaintiff's family, is immaterial, and is not reversible error.

8. Questions of Law—Findings of Jury—Harmless Error.

Questions of law referred to the jury and properly found by them, do not constitute reversible error.

ACTION tried before *Ferguson, J.,* and a jury, May Term, 1908, of CATAWBA, to recover damages for negligence alleged in the transmission and delivery of a telegram.

The uncontradicted evidence discloses the following case: The *feme* plaintiff, on 4 September, 1907, was at her home in Catawba County, about twelve miles from Hickory, where defendant kept an office for the receipt and transmission of messages. Her husband, N. M. Cordell, was absent teaching a singing school at Berea Church, about three and a half miles from Biltmore, Buncombe County, at which place defendant kept an office, and two and a half miles from Azalea. He boarded in the neighborhood with his pupils. Daniel Cordell, his uncle, lived about one mile from Berea Church. His postoffice was at Glen Inglis, Azalea being the station on the railroad where there was a telegraph office. Swannanoa and Biltmore are on the railroad between Hickory and Asheville, and there are telegraph offices at both stations. Daniel Cordell was at Azalea on 4 September, 1907. The *feme* plaintiff's child was dangerously sick and died on that day. About four o'clock in the morning she sent her son, O. B. Cordell, a boy of sixteen years of age, to Hickory, for the purpose of sending a message to her husband. She gave him ten dollars with which to pay for the message. He testified in regard to his visit to the defendant's office: "I am seventeen years old and am the son of N. M. Cordell and wife L. B. Cordell. I was at home on 4 September, 1907. I know what this suit is about. My mother woke me up at twelve o'clock in the night and told me that I would have to go for the doctor, and I went for Dr. Hoover. I left home at four o'clock that morning to go to telegraph for my father. No one but my home folks and my grandmother were at home between twelve and four o'clock. I reached Hickory about six o'clock and went to the telegraph office, and gave the boy my little piece of paper that had been written on. He picked it up and looked at it, and told me to wait a few minutes until

the gentleman came in. I did not know him at the time, but learned afterwards that it was Mr. Foster. He took up the paper and looked at it, and said he did not know where Azalea was; that he did not know anything about the place. He asked me how far I lived from Hickory, and I told him twelve miles. He tore off three blanks for telegrams, and he told me to take them home and tell those people to fill them out. I took them home and gave them to my mother, and told her where he said to fill them out, and what to put in. Foster just told me to take the blanks home and tell those people to fill them out to go where we wanted them to—to Swannanoa, Biltmore or Asheville. There was no other conversation about the place to send them or about what was the place. After I reached home I gave the blanks to my mother, and told her he said he could not send the message to Azalea, that he did not know anything about the place. I told her he showed me where to fill it out, where to put the names and where it was to go. She and my sister filled them out after I showed her, and I went to get another horse. I got Jake Heffner's horse and went back home, and they had the telegram waiting. I took them and started back to Hickory. I got there about three o'clock in the afternoon, went to the telegraph office and gave the two papers to Foster. Foster looked at them and said, 'these are not right yet.' I told him my mother had never written telegrams or had anything to do with it, and she did not know how. He said that it did not make a damn bit of difference; that they were not responsible for her ignorance. I asked him if he could telegraph to Asheville, and he said, 'I guess so, but how far is it from this place, Swannanoa, to where he is?' I told him I thought it was three or four miles. He said it would cost twenty-five cents or seventy-five cents a mile to get the message to my father. I told him it did not make any difference what it cost; that I had the money to pay for it, and it had to be sent. He said the wires were down, and that they did not

have a damn bit more sign of a wire than I had.  I had ten
dollars in money, one five dollar bill and the other in one dol-
lar bills.  My mother gave it to me that morning when I
left home.  After Foster told me that he did not have any
wire, I went out and went home.  I did not see Foster any
more, and carried Exhibits 'A' and 'B' back home with me.
I reached home a little before sundown.  Foster read both
Exhibits 'A' and 'B.'  The paper which I carried to Foster
the first time I went to the telegraph office in Hickory that
morning was carried back by me, and about the last of the
next week I gave it to my father, N. M. Cordell.  I have not
seen it since that time and do not know where it is now."

The telegrams referred to in the testimony as Exhibits A
and B, were in the following words:

"4 September, 1907.

"To Danel Cordell.  Tell Noah Cordell to come home at
once.  Message to be returned for comparison.

"Swannanoa.

"To Danel Cordell.  Tell Noah Cordell to come home at
once.

"Swannanoa. ·

"4 September, 1907. ·

"To Danel Cordell.  Tell Noah Cordell to come home this
evening, that his child is just alive.  Message returned for
comparison.

"Biltmore.

"The child died Wednesday, and was buried on Thursday
evening, 5 September, 1907."

*Feme* plaintiff was asked: "Why did you bury him on
Thursday?"  She answered: "The doctor advised me to do
it—he had the fever."  "What was the condition of the rest
of your family?"  "I had another sick child."  "How many
children have you?"  "Eight living children."  To each of
the foregoing questions and answers defendants duly ex-
cepted.  Two trains passed Swannanoa, Biltmore and Azalea

each day, going towards Hickory. Plaintiff's husband reached home Saturday, when he first learned that his child was dead. He testified that he would have gone home at once if he had received the telegram. Defendant demurred to the evidence. Demurrer overruled and defendant excepted. Defendant submitted a series of special instructions presenting the same questions raised by the demurrer, all of which were refused, and defendant excepted. The following issues were submitted to the jury:

1. Did plaintiff tender to the defendant for transmission and delivery the said message mentioned in the complaint? Answer: "Yes."

2. Was the said message in such form that it was the defendant's legal duty to receive it? Answer: "Yes."

3. Did the *feme* plaintiff tender or offer to pay or guarantee the charges for the transmission and delivery of said message? Answer: "Yes."

4. Did the defendant unlawfully refuse to receive and transmit and deliver the said message? Answer: "Yes."

5. Did the *feme* plaintiff suffer mental anguish by reason of the defendant's failure to receive, transmit and deliver said message? Answer: "Yes."

6. What damages, if any, is the *feme* plaintiff entitled to recover? Answer: "Yes, damages $1,250.00."

His Honor's instructions to the jury are set out in full. Defendant noted a number of exceptions. Judgment was rendered upon the verdict and defendant appealed.

*Hufham & Whitener* and *W. A. Self* for plaintiff.
*Tillett & Guthrie* and *A. A. Whitener* for defendant.

CONNOR, J. A large number of exceptions and assignments of error are set out in the record, but counsel concede that the merits of the case may be discussed and disposed of without specific reference to each of them. The contention of the

defendant involves three propositions : 1st. That the evidence discloses no cause of action ; 2nd, that if any cause of action is shown, only nominal damages can be recovered; 3d, that his Honor committed error in admitting testimony upon the fifth and sixth issues. The evidence does not disclose a breach of contract, but refusal to enter into a contract to perform a public duty, to receive for transmission messages set out in the record. The right of the *feme* plaintiff, therefore, to maintain her suit depends upon the answer to the inquiry whether the defendant owed her the duty to receive for transmission the messages tendered it. That a telegraph company is engaged in a public business, owing a public duty to serve any member of the public who may apply to it for service in its corporate business, in conformity to its reasonable rules and regulations, is not an open question in this or any other American court. When, therefore, a person presents a message at one of its offices during office hours, to which there is no lawful objection, and pays or tenders the usual charges therefor, it is the duty of the company's operator, or other agent, to receive and promptly transmit it. A refusal to do so without legal excuse, is an actionable tort, for which such person may recover all such damages as proximately flow therefrom. This right of action is not based upon contract, but upon a breach of duty. This Court, in discussing the cases wherein the plaintiff has sued for damages for failure to deliver, after a contract has been entered into, has uniformly recognized this principle. In *Laudie v. Tel. Co.,* 124 N. C., 528, *Douglas, J.,* said : "Moreover, the defendant, as a common carrier, owed to the plaintiff a public duty which it should have performed with reasonable care and diligence. It cannot be relieved of liability for the proximate results of its own negligence, if it existed, by unreasonable regulations or technical objections." In *Green v. Tel. Co.,* 136 N. C., 489, the same Justice says : "A telegraph company is a quasi-public corporation—private in the ownership of its stock, but

public in the nature of its duties. .. . . Hence it follows, both upon reason and authority, that the failure of a telegraph company to promptly and correctly transmit and deliver a message received by it, is a breach of public duty imposed by operation of law." In *Tel. Co. v. Biehaus,* 8 Ind. App., 246, 4 Am. Elec. Cas., 723, it is said: "Telegraph companies are quasi-public corporations and are, under the general duty they owe to the public, required to transmit and deliver any message given to them for that purpose, on the payment or tender of the usual charges, with reasonable diligence." Joyce on Elec. Law, sec. 733, says: "If a message is tendered to a telegraph company with the requisite lawful charges, it is obligated to receive the same for transmission." Jones on Tel. Co.'s, sec. 266. In *Gray v. Tel Co.,* 87 Ga., 350, 27 Am. St. Rep., 260, 14 L. R. A., 95, *Bleckley, C. J.,* says: "Telegraph companies, like common carriers, are voluntary servants of the general public. They exercise a public employment and offer themselves for the transaction of business, in behalf of every person who seeks to engage their skill and their special facilities for a peculiar class of work. Their relation to the public imposes upon them the duty of undertaking, as well as the duty of performing, and the violation of either duty is a misfeasance—a tort."

It was the manifest duty, therefore, of the defendant's operator to receive for transmission the message tendered by plaintiff's son, unless excused or justified for its refusal by reason of something found in the evidence taking the message out of the general rule. There is no suggestion that the time, manner of tendering or the contents of the messages were not in accordance with the rules and regulations of the company, or that the charges were not tendered. But two objections were made to receiving them. It is said that they were not properly addressed. The testimony shows that the *feme* plaintiff first sent her son from her home, twelve miles distant, at midnight, with a piece of paper on which some words were

written. He reached the office at six o'clock in the morning and offered the message to the operator. It is evident that, in her efforts to write a message, she gave notice to the operator that she wanted to notify her husband, at Azalea, of the extreme illness of her child. The son says that the operator "took up the paper and looked at it, and he said he did not know where Azalea was; that he did not know anything about the place. He asked me how far I lived from Hickory. I told him twelve miles." It is a reasonable inference that the operator was put upon notice that the message was urgent, and that it was to go to Azalea. It would not seem unreasonable to say that he should have aided the boy in putting the message in proper form to send. Instead of doing so, he gives him three blanks and sends him home—a distance of twelve miles—telling him "to tell those people to fill them out." The boy returned home, gave his mother the blanks and "told her where he said to fill them out and what to put in." She, with the assistance of her daughter, "filled them out," while the son borrowed a horse from a neighbor and returned to Hickory to make a second attempt to communicate with his father. When he showed the message to Foster, his only response was: "These are not right yet." The boy's account of the conduct of the operator exhibits an indifference not only to his duty, but to the dictates of common humanity. He made no offer to correct the message, put it in proper form, or to understand its terms. It is perfectly obvious that, by the use of ordinary intelligence, he could, in the light of the first visit of the son and the language used by him, have easily understood that one of the messages was to be sent to Swannanoa and the other to Biltmore. To question this is to impute to him a degree of ignorance unfitting him to hold the position which he occupied. Hickory is a town of several thousand inhabitants; it is unthinkable that the defendant company employed an operator there who did not know from the message, and the action of the boy, that

the plaintiff wished to send a message to Daniel Cordell at the places named, directing him to notify her husband to "come home at once"—that "his child was just alive." Instead of putting the message in proper form, if it was not so, or aiding the boy in doing so, or sending it as it was written, he contents himself, when told by the boy that his mother "had never written telegrams," with the declaration that it did not make a bit of difference, that they were not responsible for her ignorance. The entire evidence shows a cruel, wanton disregard of duty, and indifference to the rights of plaintiff.

It is said that the messages were not signed. This is not necessary unless the contents indicated some unlawful purpose or were calculated to arouse a well grounded suspicion that there was some improper reason for withholding a signature. While there are limitations upon the duty of telegraph companies to receive messages in cipher, or containing libelous matter, or disclosing an unlawful design, there was nothing in these messages bringing them within such limitations. Whether, when a message is offered which, by reason of the ignorance of the sender, is not in proper form, but the meaning of which is clear, it is the duty of the operator to aid or advise him how to put it in proper form, so far as to express his meaning, is not presented in this appeal. It would seem to be a reasonable requirement. The operator in this case made no offer or suggestion to the boy to aid him, although both the language of the message and the statement of the boy clearly indicated to him what plaintiff wished and was endeavoring to do. As if to rid himself of the boy, he said that it would take "twenty-five or seventy-five cents a mile to get the message to his father." The boy promptly met this objection by saying that it did not make any difference what it cost, that he had the money to pay for it, and it had to be sent. He did have the money. The operator thereupon said that the wires were down. Baffled in his efforts to send the

message, the boy "went out and went home." We are unable
to find a semblance of excuse for the refusal of the operator
to send the messages. Can it be doubted that if sent to either
Biltmore or Swannanoa, exactly as they were written, and,
if received by Daniel Cordell and communicated to the hus-
band, that he would have understood their meaning? That
the words "come home at once" or "come this evening, your
child is just alive," would have brought him promptly to his
wife in distress? He says that he would have gone to her.
Certainly the operator had no right to assume that the mes-
sage, as written, would not have accomplished their purpose.
"The sender is assumed to know the name of the party to
whom he desires the message to be sent, where he resides, and
that he has written this accurately and correctly on the tele-
gram." Jones, Tel. Co., sec. 303. What possible difference
can it make if the address is written on some other part of the
blank than is usual? If a letter was addressed as these mes-
sages, is there any doubt that it would have been forwarded
to Swannanoa or Biltmore? To hold that every person send-
ing a telegraphic message must have the same experience and
use the same degree of intelligence, would be to exclude many
who have had no such experience from the benefit of this
public agency. Especially would this result follow in many
cases if the operator may fix his own standards of the form
of a message, refuse to act upon any other information and
refuse to perform the service, as in this case, because "he was
not responsible for the ignorance" of the sender. It is evi-
dent from the language used by the operator that he knew that
the messages were to go to Swannanoa and Biltmore. Consid-
ered from any point of view, or in any aspect, the defendant
was guilty of an aggravated breach of duty to *feme* plaintiff.
She is entitled to such damages as proximately resulted from
its wrongful refusal to receive her messages for transmis-
sion. It is not a negligent failure to perform the terms of a
contract, but a tort, with many elements of aggravation;

Plaintiff is entitled to recover, at least, compensation for any injury which she sustained by reason of the tortious conduct of defendant.

The rule prescribing the measure of damages for breach of contract, as laid down in *Hadley v. Baxendale,* 9 Exch., 341, cited and applied in *Williams v. Tel. Co.,* 136 N. C., 84, has no application here. If the defendant had undertaken to transmit and deliver the messages promptly and had negligently failed to do so, we would inquire what damages were reasonably within the contemplation of the parties, as in Williams and similar cases. Here the defendant's liability is measured by the rule laid down in *Ramsbottom v. R. R.,* 138 N. C., 38, and *Johnson v. R. R.,* 140 N. C., 574. "Every man, in law, is presumed to intend any consequence which naturally flows from an unlawful act, and is answerable to private individuals for any injury so sustained," citing *Welch v. Piercy,* 29 N. C., 365. "There need not be in the mind of the individual whose act or omission has wrought the injury, the least contemplation of the probable consequences of his conduct; he is responsible therefor because the result proximately follows his wrongful act or non-action." 1 Sutherland, Dam. 16. "The real question in these cases is, did the wrongful conduct produce the injury complained of, and not whether the party committing the act could have anticipated the result." Hale on Damages, 36, 8 Am. & Eng. Enc. (2nd Ed.), 625; *Allison v. Chandler,* 11 Mich., 561. The defendant may not say that its operator did not anticipate that his refusal to receive and transmit the message would cause the *feme* plaintiff mental anguish. The message gave him notice that mental anguish would follow the failure to receive for transmission. The unusual efforts made to have it sent, the offer to prepay all charges, and all of the surrounding conditions, must have impressed a man of ordinary intelligence with the urgency of the message. He knowingly and wilfully refused to send the messages, and his employer

is liable for such damages as plaintiff sustained by reason thereof.

But defendant says that it is not shown that if the message had been sent, that Daniel Cordell would have received it, or that, if he received it, that he would have notified plaintiff's husband. It is more than probable that if it had discharged its duty at Swannanoa or Biltmore, the message would have reached Daniel Cordell. Whether it would have done so was not for the defendant to say, but for the jury. If Daniel Cordell, the uncle of Noah, had received the message, he certainly could have delivered it or notified Noah. He lived one mile from Berea Church, where Noah was teaching music and boarding about in the neighborhood. Whether he could and would have done so was for the jury to say. There was ample evidence to carry these questions to the triers of the fact. They had a right to assume that defendant's agents at Biltmore or Swannanoa would perform their duty, using due and reasonable diligence to deliver, and it was entirely competent for them to find that, by such diligence, a delivery would have been made. They may have reasonably found that Daniel Cordell could and would have promptly notified Noah. There was evidence that two trains each day passed the stations going to Hickory, on the same line of track and not far distant. These questions were submitted to the jury, under correct instructions; that the *feme* plaintiff suffered mental anguish by reason of the absence of her husband, is not only proven, but so manifest that the jury could not have found otherwise.

Defendant assigns as error the admission of the testimony in regard to the burial of the child on Thursday. We can see no basis of complaint. It may have been suggested that she should have waited a longer time for her husband to get home. To meet this, it was competent for her to say why the burial was on Thursday.

She was permitted to say that she had another sick child,

and that she had eight living children. To this defendant excepts. We do not perceive how this evidence could prejudice defendant. It was, at the most, immaterial. We have examined his Honor's instructions with care.

It would seem that the second and fourth issues involved questions of law. If so, the jury have answered them correctly.

. We find no error in the instructions given the jury. The findings of fact establish plaintiff's cause of action, and that she sustained damage, the amount of which has been fixed by the jury. It will be certified to the Superior Court of Catawba County that there is

No error.